IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

AARON T. LUNEKE,

Defendant.

8:24CR124

TRIAL BRIEF

The United States, by and through its undersigned counsel hereby provides this trial brief in anticipation of the jury trial of defendant, Aaron T. Luneke (hereinafter "Luneke"), set for February 23, 2026.

**Case Status**

Luneke is charged with one count of Attempted Bank Fraud (Count I), in violation of 18 U.S.C. § 1344, and one count of Bank Fraud (Count II), in violation of 18 U.S.C. § 1344. Filing 1. As alleged in the Indictment, Luneke engaged in a scheme to defraud financial institutions from on or about February 1, 2021, through on or about June 30, 2021. On August 12, 2024, Luneke appeared before the Magistrate Judge and entered a plea of not guilty to the charges. Filing 9. Trial is scheduled for February 23, 2026.

**Anticipated Facts**

***The Defendant and His Dual Roles***

From approximately July 2018 through May 2022, Luneke served as the Chief Financial Officer ("CFO") of Bank of the Valley ("BOV"), a financial institution headquartered in Bellwood, Nebraska, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"). In his capacity as CFO, Luneke was responsible, among other things, for overseeing the financial operations and management of the bank's investment portfolio. He was intimately

familiar with bank lending standards, loan-to-value requirements, underwriting criteria, and the documentation financial institutions require before extending credit.

While serving as CFO of Bank of the Valley, Luneke also held substantial ownership interests in Living Waters Real Estate, LLC ("Living Waters"), and Shine Express Wash, LLC ("Shine Express"), Nebraska limited liability companies organized to own and operate a commercial car wash facility in Columbus, Nebraska. Nathan Fichter, Jerome Pieper, and others also held ownership interests in the companies. Luneke's dual roles—as a senior bank executive and as a substantial owner of a borrowing entity—placed him in a unique position to understand exactly what documentation lending institutions would require and to exploit that knowledge for personal gain.

### *The Living Waters Car Wash Project*

In or about February 2020, Living Waters undertook the construction of a commercial car wash facility in Columbus, Nebraska. The project required substantial initial financing. The general contractor on the project was Foreman Lumber, owned and operated by Craig Foreman, a general contractor based in Columbus, Nebraska. The electrical work on the project was performed by Langer Electric, owned and operated by Christopher Langer, an electrician based in Blair, Nebraska.

The evidence at trial will show that the actual cost of construction work on the car wash exceeded $3.1 million. As construction costs outpaced projections, Luneke and Living Waters took on additional debt to finance the construction. When construction was complete, Foreman Lumber submitted its final bill to Living Waters for remaining unpaid construction costs totaling approximately $368,750. Langer Electric's final bill for work completed was approximately $45,000.

### The Scheme: Inflated Invoices

Despite these actual costs, Luneke directed Craig Foreman to prepare and submit an invoice reflecting construction costs of approximately $569,700—an inflation of approximately $200,950 over the actual cost of work performed. Similarly, Luneke directed Christopher Langer to prepare and submit an invoice reflecting electrical costs of approximately $150,000—an inflation of approximately $105,000 over the actual cost of approximately $45,000. In total, the invoices were inflated by approximately $305,950.

These were not good-faith advance payments for future work, or payments of earned fees. The evidence will show that around the time the car wash loan was maturing, Luneke instructed both Foreman and Langer to submit or resubmit inflated invoices. Both contractors complied with Luneke's direction.

### The Kickback Payments

The evidence will show that after Foreman and Langer submitted the inflated invoices at Luneke's direction, Luneke used the invoices to request larger loan amounts from Stearns Bank and Bank of the Valley. After he obtained the additional loan proceeds, Luneke paid the contractors and received kickback payments from both contractors that corresponded to the amount the invoices were inflated. Specifically, Foreman returned approximately $200,000 to Luneke—an amount that corresponds closely to the $200,950 inflation on the Foreman Lumber invoice. Langer returned approximately $105,000 to Luneke—an amount that corresponds precisely to the $105,000 inflation on the Langer Electric invoice.

These kickback payments were made to Luneke personally, not to Living Waters Real Estate, LLC. The kickback payments demonstrate that the purpose of inflating the invoices was not to fund the car wash project, but to generate excess funds that would flow through the

3

contractors and back to Luneke to repay debts Luneke hid from the banks and for his personal benefit. In total, Luneke received approximately $305,000 in kickback payments.

### Count I: Stearns Bank Loan Application ($3,500,000)

Beginning in or around February 2021 through April 2021, Luneke attempted to refinance $2,700,000 in existing construction loans held by BOV, of which $2,475,000 was set to mature in April 2021. On behalf of Living Waters, Luneke applied to Stearns Bank for a loan in the amount of approximately $3.5 million.

As part of the loan application and underwriting process, Luneke submitted the fraudulently inflated invoices from Foreman Lumber and Langer Electric to support the property valuation and the loan-to-value ratio required for loan approval. The inflated invoices served a critical function in the Stearns Bank loan application: by overstating the cost of construction, Luneke used them as the basis to inflate the appraised value of the car wash property, which in turn allowed Living Waters to meet the loan-to-value thresholds required for the $3.5 million loan. In addition to the inflated invoices, Luneke also failed to report outstanding personal and corporate car-wash-related debts to family members in the loan application and communications with Stearns Bank. He also failed to disclose the true beneficial owners of his purported 40% ownership share in Living Waters. These omissions were material because lenders rely on complete and accurate disclosure of a borrower's financial obligations when making lending decisions. Had the actual construction costs, borrower debt, and true ownership been reported, the property would have been valued significantly lower, the loan-to-value ratio would not have supported the requested loan amount, and Stearns Bank would have been alerted to two other individuals that had a financial stake in the car wash.

4

*Count II: Bank of the Valley Interim Construction Financing ($4,320,000)*

In or about April 2021 through June 2021, Luenke succeeded in refinancing the Living Waters's debt in the form of two loans totaling approximately $4,320,000. The fraudulently inflated invoices from Foreman Lumber and Langer Electric were submitted as a basis for additional construction proceeds in connection with this interim financing. The inflated invoices caused the bank to advance more money than the actual construction costs warranted, generating excess loan proceeds that ultimately facilitated the kickback payments to Luneke. Luneke again failed to disclose outstanding debts to family members and others, and the fact that others had a financial stake in the car wash.

Luneke's position as CFO of Bank of the Valley is particularly significant. As the bank's chief financial officer, Luneke was the very people responsible for safeguarding the institution's financial position. Instead of protecting the bank, he exploited his position and insider knowledge to perpetrate a fraud against his own institution.

*Discovery and Internal Investigation*

Luneke's fraudulent activities were ultimately discovered through an internal investigation at Bank of the Valley. The investigation revealed the discrepancies between the actual construction costs and the inflated invoices, as well as the kickback payments flowing from Foreman and Langer back to Luneke. This internal investigation led to a referral to federal law enforcement and the initiation of a federal investigation by the FBI, Federal Deposit Insurance Corporation Office of Inspector General, Federal Housing Finance Agency Office of Inspector General, and Federal Reserve Board Office of Inspector General that resulted in the present charges.

**Statute and Elements of Charged Conduct**

Pursuant to Title 18, United States Code, Section 1344, it is a criminal act for a person to:

"[K]nowingly execute[], or attempt[] to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

*See* 18 U.S.C. § 1344. The penalty for bank fraud is a fine of not more than $1,000,000 or imprisonment of not more than 30 years, or both.

As to **Count I (Attempted Bank Fraud — Stearns Bank)**, the Government must prove beyond a reasonable doubt:

**(1)** The defendant knowingly executed or attempted to execute a scheme or artifice to obtain moneys, funds, or other property owned by, or under the custody and control of, Stearns Bank by means of material false or fraudulent pretenses, representations, or promises;

**(2)** The defendant did so with intent to defraud; and

**(3)** Stearns Bank was insured by the Federal Deposit Insurance Corporation.

As to **Count II (Bank Fraud — Bank of the Valley)**, the Government must prove beyond a reasonable doubt:

**(1)** The defendant knowingly executed or attempted to execute a scheme or artifice to obtain moneys, funds, or other property owned by, or under the custody and control of,

6

Bank of the Valley by means of material false or fraudulent pretenses, representations, or promises;

**(2)** The defendant did so with intent to defraud; and

**(3)** Bank of the Valley was insured by the Federal Deposit Insurance Corporation.

The United States has submitted proposed jury instructions to the Court which include the elements of both charged counts, as well as instructions on attempt (Instruction 8.01), the definition of "scheme or artifice," the meaning of "material," the definition of "intent to defraud," and the good faith defense (Instruction 9.08A).

### **Witnesses**

The Government has filed a list of witnesses for this trial. Currently, the Government anticipates calling approximately 12 witnesses:

1. Craig Foreman — Owner of Foreman Lumber, the general contractor on the Living Waters car wash. Will testify regarding Luneke's direction to inflate the construction invoice and the approximately $200,000 in kickback payments to Luneke.

2. Christopher Langer — Owner of Langer Electric, the electrical subcontractor. Will testify regarding Luneke's direction to inflate the electrical invoice and the approximately $105,000 in kickback payments to Luneke.

3. Korey Young — Stearns Bank, N.A. Will testify regarding the Stearns Bank loan application, underwriting process, and the documentation submitted by Luenke, including the inflated invoices.

4. Jason Lavicky — Bank of the Valley. Will testify regarding BOV operations and organization, Luneke's hiring and duties as CFO of the bank, loans to executives, and specifically, those to Living Waters.

5. Bill Brookhauser — Bank of the Valley. Will testify regarding bank operations, Luneke's role as CFO, the internal investigation, and the preparation of summary charts.

6. Michaela Wegener — Bank of the Valley. Will testify regarding banking records and loan documentation, compliance and the internal investigation.

7. Jack Schmid — Bank of the Valley. Will testify regarding the Board of Directors role in approving loans to executives and operation of the loan committee.

8. Eli Vossler — Bank of the Valley. Will testify regarding banking records and loan documentation, compliance and the internal investigation.

9. Charles Dodds — FDIC Examiner. Will testify regarding FDIC the examination of BOV in early 2021—including concerns raised to the bank regarding the Living Waters loans.

10. Patricia Sue Brouillette — Will testify regarding relevant financial records or transactions.

11. Nathan Fichter — majority owner of Living Waters Real Estate, LLC, and Shine Express Wash, LLC. Will testify regarding the organization and operations of the companies, Luneke's role in the entities, and loans to Living Waters and Luneke.

12. SA Mike Bernier — FRB-OIG Special Agent and case agent. Will testify regarding the investigation, the Defendant's statements, and the preparation of summary charts.

**Evidentiary Issues**

***Res Gestae and Rule 404(b) Notice***

The Government intends to introduce evidence that Luneke submitted the same fraudulently inflated invoices and failed to report outstanding debts in loan applications to financial institutions beyond those specifically charged, around the same time and after the charged conduct. The Government contends that this evidence is admissible under Federal Rule of Evidence 404(b) to prove Luneke's intent to defraud, knowledge that his representations were false, absence of mistake or accident, and the existence of a common plan or scheme. The Government further contends that much of this evidence is inextricably intertwined with the charged conduct and is thus intrinsic evidence not subject to 404(b) analysis.

To the extent the Court determines that any of this evidence is subject to Rule 404(b), the Government asserts it is admissible under the four-part test set forth in *United States v. Johnson*, 439 F.3d 947, 952 (8th Cir. 2006): (1) the evidence is relevant to the material issues of intent, knowledge, and plan; (2) the prior acts are proved by a preponderance of the evidence; (3) the evidence is probative; and (4) its probative value is not substantially outweighed by unfair prejudice. The proposed jury instructions already include a 404(b) limiting instruction (Instruction 2.08).

***Rule 1006: Summary Charts***

The Government plans to offer Summary Exhibits pursuant to Federal Rule of Evidence 1006. With over 130 exhibits spanning records from multiple financial institutions and contractors, the Government intends to offer summary charts that compile the key financial data for the jury,

including: (1) an invoice comparison chart (actual vs. inflated costs); (2) a flow-of-funds chart tracing the kickback payments; (3) a loan application timeline; (4) a debt concealment comparison chart, (5) a summary chart of BOV's investigation, how the loan proceeds were used, comparison of the various car wash appraisals, and tracking construction costs.

Fed. R. Evid. 1006 authorizes the contents of voluminous writings, which cannot be easily examined in court, to be presented in the form of a chart, summary, or calculation. The use of a chart is proper where (1) it fairly summarizes the evidence, (2) it is used as an aid in understanding the testimony already introduced, and (3) the witness who prepared the chart is subject to cross-examination. *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980). The summary charts will be prepared by witnesses to be called at trial, who will be subject to cross-examination.

### Business Records

**Bank of the Valley Records.** The Government intends to offer records from Bank of the Valley, including personnel records of Luneke, bank account records for Living Waters, loan files, credit memoranda, draw requests, wire transfer records, disbursement authorizations, contractor payment records, appraisal reports, internal investigation documents, and BOV presentation materials. The records were obtained pursuant to legal process and have been produced in discovery. The Government and Defense have discussed agreeing on stipulations of authenticity covering these records and will file agreed upon stipulations before trial. To the extent the records constitute hearsay, they are admissible as business records under Rule 803(6) and are self-authenticating under Rule 902(11). This category also encompasses the Foreman Lumber and Langer Electric transaction records, including invoices, wire tickets, DDA statements, cashier's checks, wire transfer reports, disbursement requests, text message communications between Luneke and the contractors, and the Foreman Lumber line of credit documents. Luneke's text messages are admissible as statements of a party opponent under Rule 801(d)(2)(A).

**Stearns Bank Records.** The Government intends to offer records from Stearns Bank, including loan application materials, budget and project cost documentation, construction invoices submitted to Stearns Bank (including the inflated Foreman Lumber and Langer Electric invoices), Luneke's personal financial statement, individual certification, resume, and correspondence. These records are business records admissible under Rule 803(6) and self-authenticating under Rule 902(11). They were also prepared and submitted to Stearns by Luneke.

**Investigation and Additional Records.** The Government intends to offer additional records including the FDIC Report of Examination, Bank of the Valley internal investigation documents for multiple accounts, loan records, additional Foreman Lumber invoices, and documents created by Luneke and stored on Luneke's work computer. These records are business records under Rule 803(6) and self-authenticating under Rule 902(11).

### Statements of the Defendant

The Government intends to introduce non-custodial, recorded statements Luneke made to federal agents, as well as text message communications between Luneke and the contractors. These are admissible as statements of a party opponent under Rule 801(d)(2)(A).

### Anticipated Defense Arguments and the Government's Response

The Government anticipates filing an Omnibus Motion in Limine to preclude the following anticipated defense arguments. The Government summarizes its position here for the Court's convenience.

### 1. Good Faith / No Intent to Defraud

The proposed jury instructions include a good faith instruction (Instruction 9.08A). The Government anticipates that the Defendant will argue that he acted in good faith—that the inflated invoices was a simple way to extract the "sweat equity" he and the other owners built-up in the

business, that he believed the car wash was a sound investment, and that he was entitled to the money.

**Government's Response:** The good faith instruction itself forecloses this argument where the evidence shows the Defendant knowingly made false representations. Instruction 9.08A provides: "even though a defendant honestly held a certain opinion or belief (such as a belief that a business venture would ultimately succeed), a defendant does not act in good faith if he or she also knowingly made false or fraudulent representations or promises." The evidence of Luneke's direction to inflate the invoices and his receipt of $305,000 in kickback payments is devastating to any good faith claim.

### 2. Industry Practice / Everyone Does It

Relatedly, the Defendant may argue that inflating construction invoices is common or accepted practice to negate criminal intent.

**Government's Response:** Industry custom cannot legalize conduct that violates a federal criminal statute. Evidence of industry custom is not admissible to negate fraudulent intent. *See, e.g., United States v. Brooks*, 681 F.3d 678, 709 (5th Cir. 2012) (noting industry practice evidence offered to negate intent properly excluded because it's irrelevant and posed threat of confusing jury). An invoice that states $569,700 when the actual cost was $368,750 is false regardless of what others in the industry may do. Moreover, the kickback payments demonstrate that this was not an accepted practice but a deliberate scheme to divert funds.

### 3. No Actual Loss to the Banks

The Defendant may argue that the banks suffered no actual financial loss.

**Government's Response:** Actual loss is not an element of bank fraud. 18 U.S.C. § 1344 requires only that the defendant knowingly executed or attempted to execute a scheme to defraud

12

by means of false pretenses. *See Neder v. United States*, 527 U.S. 1, 24–25 (1999); *United States v. Edelmann*, 458 F.3d 791, 808 (8th Cir. 2006).

### 4. The Victim Banks Failed to Detect the Fraud

The Defendant may argue that Bank of the Valley should have caught the fraud—that their due diligence was inadequate.

**Government's Response:** A victim's failure to detect fraud is not a defense. *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004). This argument is particularly improper here because Luneke was the CFO of Bank of the Valley—one of the executives responsible for financial oversight—making a "they should have caught me" defense an argument that his own institution's controls were inadequate.

### 5. Entitlement to the Funds

The Defendant may argue that as an owner of Living Waters and Shine Express, and because of all the hours he worked on the construction project, he was entitled to the loan proceeds.

**Government's Response:** Entitlement is not a defense where funds are obtained through fraud. *United States v. Hamilton*, 499 F.3d 734, 737 (7th Cir. 2007). The kickback payments— $305,000 returned to Luneke personally, not to Living Waters—negate any entitlement claim. While some of the money flowed back into the project, they were used to repay undisclosed debt that were also fraudulently hidden from the banks; and some of the funds flowed directly to Luneke for his and others personal benefit.

### 6. Criminal Penalties and Collateral Consequences

Should Luneke attempt to elicit testimony as to the seriousness of the crime, criminal penalties, or collateral consequences, the Government would object. Evidence of possible criminal penalties or collateral consequences of conviction, introduced to garner jury sympathy, is improper. The Government requests the standard jury instructions in this regard: "Do not allow

13

sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you." Model Crim. Jury Instr. 8th Cir. 1.01 (2025).

**Estimated Length of Case-in-Chief**

The Government estimates that its case-in-chief will require approximately four to five trial days.

**Conclusion**

The evidence at trial will prove beyond a reasonable doubt that Aaron T. Luneke, a bank executive entrusted with the financial oversight of Bank of the Valley, exploited his position and insider knowledge to perpetrate frauds against multiple financial institutions. He directed two contractors to inflate their invoices by a combined $305,950, used those inflated invoices to attempt to and to obtain millions of dollars in construction financing, concealed personal and business debts from lenders, and used some of the proceeds for his benefit. This was not a mistake, a misunderstanding, or common practice. It was a calculated scheme by a sophisticated financial professional who knew exactly what he was doing.

DATED this 17th day of February 2026.

UNITED STATES OF AMERICA, Plaintiff

LESLEY A. WOODS,
United States Attorney
District of Nebraska

By:    s/ Alejandro Abreu
Alejandro Abreu, OH Bar #0089477
Special Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE  68102-1506
Tel: (213) 828-0023
E-mail:  alejandro.abreu@usdoj.gov

14

s/ Sarah A. Hinrichs
SARAH A. HINRICHS, #24335
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE  68102-1506
Tel: (402) 661-3700
Fax: (402) 661-3084
E-mail:  Sarah.Hinrichs@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all registered participants.  I also hereby certify that a copy of the same was served by regular mail, postage prepaid, to the following non-CM/ECF participants:  None.

s /Alejandro Abreu
Special Assistant U.S. Attorney