IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | CASE NO.: 8:24CR-124 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **DEFENDANT'S RESPONSE TO COURTS EXPERT WITNESS INQUIRY** |
| AARON T. LUNEKE, | ) ) | |
| Defendant. | ) ) | |

COMES NOW Defendant—by and through his attorney of record Keith Dornan—and provides this response to the Court's inquiry on its proposed expert witness.

## LAW

Under Rule 702, district courts serve a "gatekeeping function," admitting expert testimony only if it "is not only relevant, but reliable." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 776-77 (8th Cir. 2021). Rule 702 is a rule "of admissibility rather than exclusion." *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1298 (8th Cir. 1997) Thus, the "general rule" is that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *In re Bair Hugger*, 9 F.4th at 778.

If expert testimony can help the trier of fact to any degree – it should be admitted: "cases are legion that, correctly, under *Daubert,* call for the liberal admission of expert testimony. *See, e.g., United States v. Finch,* 630 F.3d 1057, 1062

(8th Cir.2011) (holding that we resolve doubts about the usefulness of expert testimony in favor of admissibility); *Robinson v. GEICO Gen. Ins. Co.,* 447 F.3d 1096, 1100 (8th Cir.2006) (holding that expert testimony should be admitted if it "advances the trier of fact's understanding to any degree" (quotation omitted)); *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir.2001) (Rule 702 "clearly is one of admissibility rather than exclusion" (internal quotation omitted)); *Wood v. Minn. Mining & Mfg. Co.,* 112 F.3d 306, 309 (8th Cir.1997) (holding that exclusion of expert's opinion is proper "only if it is so fundamentally unsupported that it can offer no assistance to the jury" (internal quotation omitted))." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).

## DEFENDANT'S EXPERT WITNESS

The Defense intends to call Mr. James Houck to provide his expert opinion on:

1) standard management fees for similar carwash builds:

2) the role of a project manager;

3) the range of reasonable fees charged for specific aspects of similar carwash builds, i.e. electrician fees;

4) the cost to build similar carwashes at that time period;

5) the cost information considered by appraisers;

I.    **Witness Qualifications**

Mr. Houck has been professionally involved with over 30 tunnel carwash builds in the United States since 2018. He was also the owner and operator of two carwashes in Colorado: Firehouse Express Car Wash, Fort Collins, Colorado: Location 1, Built in 2010; and Location 2 Built in 2017. Both Locations Sold in 2023.

Mr. Houck owns his own consulting firm named Car Wash Solutions, based in Colorado. He provides comprehensive consultation to parties interested in constructing tunnel carwashes as well as supporting existing carwashes with upgrades, equipment and maintenance. He regularly produces estimates for tunnel carwash builds as part of his profession.  He also regularly reviews estimates for tunnel carwash bids.  For his work with carwashes post-construction, he also sometimes reviews appraisals.

Mr. Houck frequently travels to potential carwash sites as well as existing carwashes in order to provide professional consultation. Mr. Houck is also a sales rep for tunnel carwash equipment and he keeps current on pricing and equipment as part of that work.

Finally, Mr. Houck is also a lay witness as he was hired as a consultant to help complete the carwash and get it operational. He was physically present at the carwash site with Defendant in addition to providing remote support via telephone. Mr. Houck supported Defendant on design, trouble shooting, making sure systems

are installed correctly, Car wash equipment instillation and commissioning of the wash.

## II.    **Issues Investigated**

Mr. Houck was asked to evaluate existing trade practices and his personal experiences related to the construction of car washes to determine (1) standard management fees for similar carwash builds: 2) the role of a project manager;  3) the range of reasonable fees charged for specific aspects of carwash builds, i.e. electrician fees; 4) the cost to build similar carwashes at that time period; 5) the cost information considered by developers and appraisers.

## III.    **Opinion of the Witness**

Mr. Houck was able to form his opinions to a reasonable degree of certainty with respect to the questions asked to investigate and relied upon theories and methodologies reasonably relied upon by experts in the field. Mr. Houck's opinions are as follows:

(1) Industry standard for similar carwash builds is a project management fee of 10-15%.

(2) The role of a general contractor is to obtain sub-contractors to complete the work necessary on a construction job according to the plans provided for the project;

(3) Fees for electrical work can range widely from $200,000 to $600,000 or more.

(4) A general cost estimate to build a similar car wash to the one built at 2583 E. 5th Ave., Columbus, Nebraska 68601, in 2020 would be between $4,750,000 and $6,000,000;

(5) Appraisers and developers consider all construction costs, including project management fees and/or the value of the work done in arriving at an opinion about value.

## IV.    Methodology Underlying the Opinion

In forming his opinions, Mr. Houck relied upon his experience within the car wash construction industry along with his own first-hand knowledge of the construction project at 2583 E. 5th Ave., Columbus, Nebraska 68601, in 2020. Relying on both his experience in the car wash industry and his own first-hand knowledge, Mr. Houck was able to form his opinions.

Mr. Houck's industry experience includes knowledge of trade practice and industry standards within the car wash construction industry, and Mr. Houck's own experience as both an owner, contractor, vendor, and consultant in the car wash industry.

Mr. Houck's first-hand knowledge includes his own observations and work performed at 2583 E. 5th Ave., Columbus, Nebraska 68601, in 2020, along with Mr. Houck's observation of Defendant's work performed at 2583 E. 5th Ave., Columbus, Nebraska 68601, in 2020.

Mr. Houck's opinions were formed to a reasonable degree of certainty and the methodologies used are general accepted in the relevant area of expertise.

## ARGUMENT

The Government has specifically alleged in its indictment, trial brief, and at trial that Defendant's "scheme or artifice" involved submitting "fraudulent" invoices in order to "inflate" the value of this carwash with the "intent to deceive". The 3 pillars of the Government's case appear to be that: 1) Defendant did not actually do $305,000 worth of work; 2) the $305,000 received from the general contractor and electrician were therefore "fraudulent"; and 3) the inclusion of those amounts led to "inflated" appraisals.

> Luneke directed Craig Foreman to prepare and submit an invoice reflecting construction costs of approximately $569,700—an inflation of approximately $200,950 **over the actual cost of work performed**. Similarly, Luneke directed Christopher Langer to prepare and submit an invoice reflecting electrical costs of approximately $150,000—an inflation of approximately $105,000 **over the actual cost** of approximately $45,000. In total, the invoices were inflated by approximately $305,950.

(Filing No. 105 at. pg. 3) (emphasis added)

The Government has also put the valuation of this carwash into issue.

The inflated invoices served a critical function in the Stearns Bank loan application: by **overstating the cost of construction**, Luneke used them as the basis to **inflate the appraised value** of the car wash property, which in turn allowed Living Waters to meet the loan-to-value thresholds required for the $3.5 million loan.

(Filing No. 105 at. pg. 4) (emphasis added)

The Government's theory is that the "inflated invoices caused the bank to advance more money than the actual construction costs warranted […]. (Filing No. 105 at pg. 5).

Defendant's position is simple: he did the work and that work had an actual value that was accurately reflected in the invoices in question. Those money in those invoices that went to Defendant represents actual construction costs that are routinely and as a part of widespread industry practice included in total construction costs. The actual work done by Defendant is routinely reflected as a general contractor fee, a management fee, a consultant fee, or a developer fee in similar carwash construction cost summaries. It is industry standard for invoiced management fees or the actual value added by developers to be reflected in appraisals. Finally, the purpose of Defendant in having that money invoiced was to accurately account for construction costs in order to support an accurate appraisal.

Evidence and testimony supporting Defendant's position that the work he did was worth $305,000 is essential to his defense.  It goes to the his *mens rea* – did he intend to deceive the bank or did he have a good faith belief that the invoices reflected actual value that he brought to the project In other words – Defendant intends to contest the Government's theories that the invoices were "fraudulent"; that they were "inflated; and that the purpose of providing those invoices was to "deceive."

To be clear, the defense does not intend to solicit evidence directly from its expert or lay witnesses as to the value of Defendant's work. The defense intends to introduce lay testimony as to the amount and type of work Defendant did at this carwash.  That evidence will be supported by expert witness testimony as to: 1) standard management fees for similar carwash builds: 2) the role of a project manager; 3) the range of reasonable fees charged for specific aspects of similar carwash builds, i.e. electrician fees; 4) the cost to build similar carwashes at that time period; 5)  the cost information considered by appraisers. That information will assist the trier of fact as they determine whether Defendant had an "intent to deceive" or whether he acted in Good Faith in regards to the invoices in question.

DATED this 27 day of February, 2026

> AARON T. LUNEKE,
> Plaintiff
>
> By:  */s Keith Dornan*
> Keith Dornan, #27570

Dornan, Howard, Breitkreutz,
Dahlquist, & Klein, P.C., L.L.O.
1403 Farnam St., Ste. #232
Omaha, Nebraska 68102
T: (402) 884-7044
F: (402) 884-7045
keith@dltlawyers.com
*Attorney for Defendant*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies a true and accurate copy of the above was served upon Plaintiff on the 27th day of February 2026 via electronic mail:

Alejandro A. Abreu          alejandro.abreu@usdoj.gov,

Sarah A. Hinrichs           sarah.hinrichs@usdoj.gov

*/s/ Keith Dornan*
Keith Dornan, #27570